UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Webster Sheet Metal Fabricators | § | Case No. 05-26649 CAD |
| | § | |
| Debtor(s) | § | |

## TRUSTEE'S FINAL REPORT (TFR)

The undersigned trustee hereby makes this Final Report and states as follows:

1. A petition under chapter 11 of the United States Bankruptcy Code was filed on 07/05/2005 . The case was converted to one under Chapter 7 on 10/04/2005 . The undersigned trustee was appointed on 10/12/2005 .

2. The trustee faithfully and properly fulfilled the duties enumerated in 11 U.S.C. §704.

3. All scheduled and known assets of the estate have been reduced to cash, released to the debtor as exempt property pursuant to 11 U.S.C. § 522, or have been or will be abandoned pursuant to 11 U.S.C. § 554. An individual estate property record and report showing the disposition of all property of the estate is attached as **Exhibit A**.

4. The trustee realized gross receipts of         $    807,848.51

Funds were disbursed in the following amounts:

| | |
|---|---:|
| Payments made under an interim disbursement | 0.00 |
| Administrative expenses | 629,566.29 |
| Bank service fees | 0.00 |
| Other payments to creditors | 0.00 |
| Non-estate funds paid to 3rd Parties | 0.00 |
| Exemptions paid to the debtor | 0.00 |
| Other payments to the debtor | 0.00 |
| Leaving a balance on hand of[1]     $ | 178,282.22 |

---

[1] The balance of funds on hand in the estate may continue to earn interest until disbursed. The interest earned prior to disbursement will be distributed pro rata to creditors within each priority category. The trustee may receive additional compensation not to exceed the maximum compensation set forth under 11 U.S.C. §326(a) on account of the disbursement of the additional interest.

UST Form 101-7-TFR (5/1/2011) *(Page. 1)*

The remaining funds are available for distribution.

5. Attached as **Exhibit B** is a cash receipts and disbursements record for each estate bank account.

6. The deadline for filing non-governmental claims in this case was 03/23/2006 and the deadline for filing governmental claims was 03/23/2006 . All claims of each class which will receive a distribution have been examined and any objections to the allowance of claims have been resolved. If applicable, a claims analysis, explaining why payment on any claim is not being made, is attached as **Exhibit C**.

7. The Trustee's proposed distribution is attached as **Exhibit D**.

8. Pursuant to 11 U.S.C. § 326(a), the maximum compensation allowable to the trustee is $ 43,642.43 . To the extent that additional interest is earned before case closing, the maximum compensation may increase.

The trustee has received $ 0.00 as interim compensation and now requests a sum of $ 43,642.43 , for a total compensation of $ 43,642.43 [2]. In addition, the trustee received reimbursement for reasonable and necessary expenses in the amount of $ 0.00 , and now requests reimbursement for expenses of $ 1,500.00 , for total expenses of $ 1,500.00 [2].
*Please refer to the "Supplement to Webster Final Report" attached hereto.
Pursuant to Fed R Bank P 5009, I hereby certify, under penalty of perjury, that the foregoing report is true and correct.

Date: 10/26/2011            By:/s/N. Neville Reid
                                   Trustee

**STATEMENT**: This Uniform Form is associated with an open bankruptcy case, therefore, Paperwork Reduction Act exemption 5 C.F.R. § 1320.4(a)(2) applies.

---

[2] If the estate is administratively insolvent, the dollar amounts reflected in this paragraph may be higher than the amounts listed in the Trustee's Proposed Distribution (Exhibit D).

UST Form 101-7-TFR (5/1/2011) *(Page: 2)*

## Supplement to Webster Final Report, Case No. 05-26649

1. **Summary of Administrative Expenses**:

Below is a summary of the cumulative professional fees incurred by the estate which constituted the bulk of overall administrative expenses:

| Firm | Disbursement |
| --- | --- |
| Mayer Brown LLP | $ 254,193.22 |
| Fox, Hefter, Swibel, Levin & Carroll, LLP | $ 5,279.00 |
| Nisen & Elliott, LLC | $ 49,387.39 |
| Randall & Kenig | $ 1,638.00 |
| Ken Novak & Associates, Inc. | $ 152,547.86 |
| Winternitz, Inc. | $ 134,170.20 |

2. **General Overview – Background for Expenses:** This converted chapter 11 case involved the liquidation of a mid-sized sheet-metal company whose principal assets were equipment and inventory, receivables, insurance premium refunds, avoidance claims, some securities and some cash. The assets were subject to the blanket lien of First Midwest Bank ("Bank"), which early in the case entered into a stipulation with the Trustee to permit recovery of estate expenses from liquidation proceeds pursuant to Section 506(c) of the Bankruptcy Code (the "Stipulation"). Pursuant to the Stipulation, the Trustee submitted all invoices for legal and professional fees to the Bank and the US Trustee in advance of filing interim applications. If objections were raised to any fees, they were resolved before the filing of or in connection with the interim fee application. The US Trustee and the Bank did not object to any fees in the case except the Bank on one of the later fee applications of Mayer Brown did file an objection which was adjudicated by the court and resulted in some reduction of Mayer Brown's fees for that particular interim application.

In order to marshal and liquidate the estate assets, the Trustee retained Ken Novak & Associates, Inc. ("Novak") as general liquidation consultant and financial advisor, with court approval. Novak was involved in every aspect of the wind-down of this company, including the assembly, retrieval and protection of estate records and property, the determination of strategy for maximizing the liquidation value of all assets, and further the recovery and liquidation of unscheduled and scheduled assets including receivables. While Novak incurred roughly $150,000 of fees in the case principally over a 3-year period, none of the roughly $573,000 of total recoveries (not including the $234,000 of cash collateral from the chapter 11) in the case would likely have occurred without Novak's indispensable assistance in the general administration of the case.

To pursue certain litigation, the Trustee also retained Nissen & Elliot as special counsel. The Trustee retained his own former firm, Mayer Brown, as general bankruptcy counsel. Finally, to assist with an auction of the assets, the Trustee retained Winternitz, Inc.

Some factors which generated substantial administrative expenses in the case, and various benefits, included the following:

    a.    <u>Organizing, securing records</u>:   The records of the company were not well-organized at the inception of the case and the principal of the debtor (Jim Webster) was not fully responsive. At one point Mr. Webster left the state to seek work in Texas or Florida. These two factors imposed greater administrative burdens on the Trustee and Novak to identify, organize and secure the records resulting in higher costs to the estate. In addition, some of the equipment and inventory were not accounted for, and the Trustee had to investigate an allegation from an employee that certain equipment and inventory was removed from the premises pre-petition by the Debtor's principal and his associates. The Trustee's effort to investigate and recover missing equipment imposed yet further costs and expenses on the estate.

    b.    <u>Auction</u>: The main event of the case was an on-site auction of the equipment and inventory. The Trustee selected Winternitz, Inc. to conduct the auction, and they offered a minimum recovery guarantee not offered by other competing auctioneers. The fee arrangement for Winternitz was approved by the court. The auction yielded $407,721 in gross receipts and Winternitz's fees were $134,170, for net proceeds to the estate of $273,551. Winternitz's fee was higher than some of the auctioneers in part because he offered the minimum guarantee of recovery for the creditors. Novak substantially assisted the Trustee and Winternitz on miscellaneous pre-auction tasks essential to the preparation and securing of equipment for the auction and generally organizing the premises for the auction, including reconciling the inventory and equipment to be sold versus the inventory and equipment shown on the Debtor's records. This analysis led to the Trustee pursuing the former owner and certain key employees in N. Neville Reid, Trustee v. James T. Webster, Scotty Gray & Mark Shanahan (see 2 a., above).

    c.    <u>Additional Recoveries, Liquidation</u>: After the auction, the Trustee proceeded to investigate and collect receivables and other personal property with the strong assistance of Novak. Receivables collections were made more difficult in part by the poor quality of estate records and the extensive time required to organize and synthesize the records, often without access to the Debtor's principals. The disposition of receivables was further complicated by the fact that both the Internal Revenue Service and the Bank claimed a lien on receivables and their respective rights therein could not be determined without Novak probing into the details of when the respective receivables were "earned" in the course of the Debtor's operations. The disagreement between the IRS and the Bank regarding their respective rights to receivables contributed in part to the delay in the closing of the case. Where receivables required litigation, the Trustee initially retained the services of the law firm Randall & Kenig ("<u>Kenig</u>"), which was recommended by the Bank and charged 50% less than the rates charged by the Trustee's general bankruptcy counsel, Mayer Brown LLP. Kenig did not collect much receivables, so the Trustee retained Nissen & Elliot to collect the balance of receivables requiring litigation at a contingency rate of 35%. Nisen & Elliott's litigation efforts resulted in the collection of $18,500 of receivables. The other receivables collection was accomplished

through extensive diligence, correspondence, negotiation and other efforts by Novak. The collective efforts of principally Novak and Nissen & Elliot resulted in the collection of $87,000 in receivables.

       d.    Avoidance Litigation: The Trustee retained Nissen & Elliot, which had a significantly lower fee structure than the Trustee's general bankruptcy counsel, Mayer Brown LLP, to assist with avoidance litigation. Nissen & Elliot recovered roughly $56,834 in avoidance claim proceeds for the estate, consisting of $36,834 in preferences for which it billed on an hourly basis and was paid $34,687 (reflecting a voluntary $16,000 fee discount; see Nissen & Elliot letter appended hereto) and $20,000 in non-preference avoidance actions for which it was paid $7,000 pursuant to a contingency rate of 35%. Some factors which added to the cost of the avoidance litigation relative to the recovery included that in certain instances some defendants (such as certain insiders who were defendants in one of the actions) were located in other states, were elusive and did not always cooperate, and that recoveries were limited by defendants' defenses that were not known or clear until costs had been incurred in discovery. [1]

       e.    Rate Increases: During the course of the case, from 2005-2008, Mayer Brown significantly increased its hourly rates which added materially to the cost of the general legal administration of the estate.

       f.    Insurance; Class Action: Novak assisted one of the Debtor's insurance carriers with a workers compensation insurance audit which resulted in a recovery for the estate. In addition, Novak assisted with a class action seeking a return of premium overcharges for the Debtor; this also resulted in a recovery for the estate.

3.    **Allocation of Receivables Proceeds**: As noted in paragraph 2(c) above, the Bank and the IRS both have liens on the receivables proceeds in the case, and their respective rights were determined by when the various receivables were deemed "earned" from various jobs done by the Debtor. Novak played a key role in developing the various cash receipts analyses requested for this allocation. After extensive negotiation, the Bank and the IRS agreed to allocate their various secured claims to receivables proceeds in the manner reflected in the Final Report, namely $78,000 to the IRS and $21,650.53 to the Bank. The secured claim of IDES is lesser in priority to the claims of the IRS and the Bank as it was filed later than those claims. The other secured claims listed in this report were satisfied by return of the respective collateral securing such claims and do not attach to the receivables proceeds funding the distributions to the IRS and the Bank.

---

[1]    Overall, Nisen & Elliott collected $75,334 in receivables and avoidance actions and was paid total fees and expenses of $49,387.

LAW OFFICES
## NISEN & ELLIOTT, LLC
SUITE 2500
200 WEST ADAMS STREET
CHICAGO, ILLINOIS 60606

DANIEL P. DAWSON

June 16, 2008

TELEPHONE
(312) 346-7800

FAX
(312) 346-9316

EMAIL
DDAWSON@NISEN.COM

**Via Messenger**
N. Neville Reid
Mayer, Brown, LLP
71 S. Wacker Dr.
Chicago, IL 60606

Re: <u>Webster Sheet Metal Fabricators, Inc.</u>
Case No.: 05 B 26649

Dear Neville:

Enclosed are three settlement checks from: (a) Thorndale Construction, Inc. in the amount of $18,500; (b) Sheet Metal Workers Local Union No. 73 in the amount of $16,000; and (c) attorneys Kolpak and Lerner, on behalf of James T. Webster, and Mark Shanahan (from Adversary No. 06-00687) in the amount of $20,000; along with: (d) a spreadsheet summarizing all of the amounts recovered by Nisen & Elliott in the above captioned bankruptcy proceedings to date.

Additionally, enclosed are bills for: (1) the preference claims; and (2) the accounts receivable claims and Adversary No. 06 A 00687; along with the orders authorizing Nisen & Elliott's retention and payment for: (3) the preference claims; and (4) the account receivable claims and Adversary 06 A 00687.

Pursuant to the orders, the Trustee shall pay 35% of the amounts recovered from the accounts receivable claims and the Adversary to Nisen & Elliott (i.e. 35% of $38,500 = $13,475) and the bank shall pay all costs and expenses related to these claims ($1,990.15). In addition, the Trustee shall pay $350.00 per hour for the services performed on the preference claims, plus expenses. Nisen & Elliott has provided 120.50 hours of service related to the preference claims. Therefore, the amount due on the preference claims equals $46,737.39 ($42,175.00 in fees and $4,562.39 in expenses). A 10% discount is also arguably applicable to the fees related to the preference claims. However, Nisen & Elliott is willing to provide a larger, voluntary discount and accept $34,687.39 for its services and expenses on the *preference claims* ($30,125.00 for its fees at $250.00 per hour plus $4,562.39 in expenses).

Thus, with the additional voluntary reduction offered by Nisen & Elliott related to the preference claims, the *total amount owed to Nisen & Elliott by the Trustee* for both the preference claims and the accounts receivable claims and Adversary No. 06 A 00687 equals **$48,162.39** if no objection is lodged within five days. In addition, *the Bank* owes Nisen & Elliott **$1,990.15**. Please let me know if you have any questions.

NISEN & ELLIOTT, LLC

Sincerely,

Daniel P. Dawson

DPD/amd

cc: Office of U.S. Trustee
First Midwest Bank