**REVISED Supplement to Webster Final Report, Case No. 05-26649**

1. **Summary of Administrative Expenses**:

Below is a summary of the cumulative professional fees incurred by the estate which constituted the bulk of overall administrative expenses:

| **Firm** | **Disbursement** |
|---|---|
| Mayer Brown LLP | $ 254,193.22 |
| Fox, Hefter, Swibel, Levin & Carroll, LLP | $ 5,279.00 |
| Nisen & Elliott, LLC | $ 49,387.39 |
| Randall & Kenig | $ 1,638.00 |
| Ken Novak & Associates, Inc. | $ 152,547.86 |
| Winternitz, Inc. | $ 134,170.20 |

2. **General Overview – Background for Expenses:**   This converted chapter 11 case involved the liquidation of a mid-sized sheet-metal company whose principal assets were equipment and inventory, receivables, insurance premium refunds, avoidance claims, some securities and some cash.  The assets were subject to the blanket lien of First Midwest Bank ("Bank"), which early in the case entered into a stipulation with the Trustee to permit recovery of estate expenses from liquidation proceeds pursuant to Section 506(c) of the Bankruptcy Code (the "Stipulation").  Pursuant to the Stipulation, the Trustee submitted all invoices for legal and professional fees to the Bank and the US Trustee in advance of filing interim applications. If objections were raised to any fees, they were resolved before the filing of or in connection with the interim fee application. The US Trustee and the Bank did not object to any fees in the case except the Bank on one of the later fee applications of Mayer Brown did file an objection which was adjudicated by the court and resulted in some reduction of Mayer Brown's fees for that particular interim application.

In order to marshal and liquidate the estate assets, the Trustee retained Ken Novak & Associates**,** Inc. ("Novak") as general liquidation consultant and financial advisor, with court approval.  Novak was involved in every aspect of the wind-down of this company, including  the assembly, retrieval and protection of estate records and property, the determination of strategy for maximizing the liquidation value of all assets, and further the recovery and liquidation of unscheduled and scheduled assets including receivables. While Novak incurred roughly $150,000 of fees in the case principally over a 3-year period, none of the roughly $573,000 of total recoveries (not including the $234,000 of cash collateral from the chapter 11) in the case would likely have occurred without Novak's indispensable assistance in the general administration of the case.

To pursue certain litigation, the Trustee also retained Nissen & Elliot as special counsel. The Trustee retained his own former firm, Mayer Brown, as general bankruptcy counsel. Finally, to assist with an auction of the assets, the Trustee retained Winternitz, Inc.

Some factors which generated substantial administrative expenses in the case, and various benefits, included the following:

a. <u>Organizing, securing records</u>:   The records of the company were not well-organized at the inception of the case and the principal of the debtor (Jim Webster) was not fully responsive. At one point Mr. Webster left the state to seek work in Texas or Florida. These two factors imposed greater administrative burdens on the Trustee and Novak to identify, organize and secure the records resulting in higher costs to the estate. In addition, some of the equipment and inventory were not accounted for, and the Trustee had to investigate an allegation from an employee that certain equipment and inventory was removed from the premises pre-petition by the Debtor's principal and his associates. The Trustee's effort to investigate and recover missing equipment imposed yet further costs and expenses on the estate.

b. <u>Auction</u>:  The main event of the case was an on-site auction of the equipment and inventory. The Trustee selected Winternitz, Inc. to conduct the auction, and they offered a minimum recovery guarantee not offered by other competing auctioneers. The fee arrangement for Winternitz was approved by the court. The auction yielded $407, 721 in gross receipts and Winternitz's fees were $134,170, for net proceeds to the estate of $273,551.  Winternitz's fee was higher than some of the auctioneers in part because he offered the minimum guarantee of recovery for the creditors. Novak substantially assisted the Trustee and Winternitz on miscellaneous pre-auction tasks essential to the preparation and securing of equipment for the auction and generally organizing the premises for the auction, including reconciling the inventory and equipment to be sold versus the inventory and equipment shown on the Debtor's records. This analysis led to the Trustee pursuing the former owner and certain key employees in N. Neville Reid, Trustee v. James T. Webster, Scotty Gray & Mark Shanahan (see 2 a., above).

c. <u>Additional Recoveries, Liquidation</u>:  After the auction, the Trustee proceeded to investigate and collect receivables and other personal property with the strong assistance of Novak. Receivables collections were made more difficult in part by the poor quality of estate records and the extensive time required to organize and synthesize the records, often without access to the Debtor's principals.  The disposition of receivables was further complicated by the fact that both the Internal Revenue Service and the Bank claimed a lien on receivables and their respective rights therein could not be determined without Novak probing into the details of when the respective receivables were "earned" in the course of the Debtor's operations. The disagreement between the IRS and the Bank regarding their respective rights to receivables contributed in part to the delay in the closing of the case. Where receivables required litigation, the Trustee initially retained the services of the law firm Randall & Kenig ("<u>Kenig</u>"), which was

recommended by the Bank and charged 50% less than the rates charged by the Trustee's general bankruptcy counsel, Mayer Brown LLP. Kenig did not collect much receivables, so the Trustee retained Nissen & Elliot to collect the balance of receivables requiring litigation at a contingency rate of 35%. Nisen & Elliott's litigation efforts resulted in the collection of $18,500 of receivables. The other receivables collection was accomplished through extensive diligence, correspondence, negotiation and other efforts by Novak. The collective efforts of principally Novak and Nissen & Elliot resulted in the collection of $87,000 in receivables.

  d. Avoidance Litigation: The Trustee retained Nissen & Elliot, which had a significantly lower fee structure than the Trustee's general bankruptcy counsel, Mayer Brown LLP, to assist with avoidance litigation. Nissen & Elliot recovered roughly $56,834 in avoidance claim proceeds for the estate, consisting of $36,834 in preferences for which it billed on an hourly basis and was paid $34,687 (reflecting a voluntary $16,000 fee discount; see Nissen & Elliot letter appended hereto) and $20,000 in non-preference avoidance actions for which it was paid $7,000 pursuant to a contingency rate of 35%. Some factors which added to the cost of the avoidance litigation relative to the recovery included that in certain instances some defendants (such as certain insiders who were defendants in one of the actions) were located in other states, were elusive and did not always cooperate, and that recoveries were limited by defendants' defenses that were not known or clear until costs had been incurred in discovery. [1]

  e. Rate Increases: During the course of the case, from 2005-2008, Mayer Brown significantly increased its hourly rates which added materially to the cost of the general legal administration of the estate.

  f. Insurance; Class Action: Novak assisted one of the Debtor's insurance carriers with a workers compensation insurance audit which resulted in a recovery for the estate. In addition, Novak assisted with a class action seeking a return of premium overcharges for the Debtor; this also resulted in a recovery for the estate.

3. **Allocation of Receivables Proceeds**: As noted in paragraph 2(c) above, the Bank and the IRS both have liens on the receivables proceeds in the case, and their respective rights were determined by when the various receivables were deemed "earned" from various jobs done by the Debtor. Novak played a key role in developing the various cash receipts analyses requested for this allocation. After extensive negotiation, the Bank and the IRS agreed to allocate their various secured claims to receivables proceeds in the manner reflected in the Final Report, namely $78,000 to the IRS and $21,650.653 to the Bank. The secured claim of IDES is lesser in priority to the claims of the IRS and the Bank as it was filed later than those claims. The other secured claims listed in this report were satisfied by return of the respective collateral securing such claims and do not attach to the receivables proceeds funding the distributions to the IRS and the Bank.

---

[1]  Overall, Nisen & Elliott collected $75,334 in receivables and avoidance actions and was paid total fees and expenses of $49,387.

Pursuant to Section 724(b) of the Bankruptcy Code and the correspondence attached hereto, the IRS acknowledges the priority of the claims of the (i) Sheet Metal Workers National Pension Fund (filed as Claim No. 61-1 and appearing as Claim 61B on the Proposed Distribution Report) in the amount of $39,747.89 (the "Pension Fund Claim")[2] and (ii) Sheet Metal Workers Local No. 73 Fringe Benefit Fund (filed as Amended Claim No. 92-2 and appearing as Claim 92B in the Proposed Distribution Report) in the amount of $27,582.80, over the secured claim of the IRS in this case. Consequently, of the $78,000 allocated to the IRS share of the receivables proceeds, the net amount to be distributed to the IRS will be $10,671.67 ($78,000 - $39,747.89 - $27,582.80). (Actual amount of cents for claims may differ slightly between the actual proofs of claim and the amounts in the Proposed Distribution due to interest accrual).

---

[2] Counsel for the Pension Fund Claim has indicated in a letter to the IRS dated December 5, 2011 their $39,746.7 priority claim as agreed to by the IRS, and has further informed the Trustee that she will file an amended Proof of Claim on December 19, 2011 to confirm the Fund's priority claim in that amount.